UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PECHINEY PLASTIC PACKAGING
INCORPORATED,

        Plaintiff and Counter-Defendant,

  v.                                                   Case No. 13-C-856

UNITED STEEL, PAPER & FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED-INDUSTRIAL AND SERVICE
WORKERS AFL-CIO LOCAL 2-0148,

        Defendant and Counter-Plaintiff,

UNITED STEEL, PAPER & FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED-INDUSTRIAL AND SERVICE
WORKERS AFL-CIO, CLC,

        Counter-Plaintiff.

## DECISION AND ORDER ENFORCING ARBITRATION AWARD

Plaintiff-counter defendant, Pechiney Plastic Packaging, Inc. (Pechiney), brought this action to vacate an arbitration award that granted its former employees severance benefits and a "make whole remedy" after Pechiney sold three of its facilities without requiring the purchaser to assume its obligations under the successorship clause of its collective bargaining agreement (CBA). The Union counterclaimed for enforcement of the award. This court has jurisdiction pursuant to Section 301(c) of the Labor Management Relations Act, 29 U.S.C. § 185(c). The parties have filed cross motions for relief and the case has been fully briefed and argued by counsel. For the reasons that follow, the Union's motion to enforce the award will be granted and Pechiney's motion denied.

# I. BACKGROUND

**A. The CBA and Asset Sale**

In 2009, Pechiney operated three facilities that were staffed by members of United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied-Industrial and Service Workers International Union, A.F.L.-C.I.O. Local 2-148 (the Union). The Union had negotiated a CBA with Pechiney that was to "remain in effect from August 1, 2006, to July 31, 2009, inclusive, and from year to year thereafter, unless terminated in accordance with Section II below." (CBA § I, Compl. Ex. 2, ECF No. 1-2 at 5.) Section II provided that if the parties had not reached agreement on outstanding issues by the time of the anniversary date of the Agreement, either party could give written notice of intent to terminate the Agreement in not less than six days. That Section further provided that if the parties had not resolved their differences before the time set forth has elapsed, "all obligations under this Agreement are automatically cancelled." (*Id.*) The CBA also contained the following provisions:

> Section XXXV
> SUCCESSORSHIP
>
> It is understood and agreed that no merger, purchase, sale, transfer, assignment or consolidation, shall terminate or suspend this contract or relieve an employer (as provided hereunder) a transferee, **purchasee**, successor, or assignee, from the obligation to comply with the terms and conditions of this contract.
>
> Section XXXVI
> SEVERANCE ALLOWANCE
>
> If the Company closes a plant completely and permanently, employees whose employment is terminated as a result thereof, and who at the time, Shall have a length

of continuous service with the Company of five years or more shall be entitled to twenty (20) hours of pay at the employee's regular rate for each year of service up to a maximum of 500 hours of severance allowance.

(CBA §§ XXXV, XXXVI, Compl. Ex. 2, ECF No. 1-2 at 50–51) (emphasis in original).

In July 2009, Pechiney informed the Union that Rio Tinto, PLC, which owned Alcan, Inc., which in turn owned Pechiney, planned to sell the three facilities at issue to Bemis Company, Inc. (Bemis). Because the intent of its parent companies was to sell the facilities, Pechiney did not intend to renew the CBA, which was due by its terms to expire at the end of the month. To avoid any lapse in the CBA before the sale occurred, however, Pechiney and the Union entered into several agreements to extend the CBA. The first such agreement extended the CBA until the end of September, 2009.

Shortly after being informed of the sale, the Union asked Pechiney if Bemis would be required to assume the existing CBA as a condition of the asset sale. Around mid-September 2009, Pechiney responded to the Union that Bemis would be under no such obligation. Two days later, on September 23, 2009, the Union filed grievance number 243-13-09. The grievance states:

| | |
|---|---|
| COMPLAINT | The Union charges the Company with a specific violation of Article(s) Sections III, IV, XV, XVI, XVII, XXVII, XXIX, XXXV and any other provisions of the Agreement that may be found to apply. |
| | STATE WHAT HAPPENED: Alcan sold Neenah, Menash and Technical Center plants to Bemis Company, Inc. without securing agreement and its benefits as a part of the sale. |
| REMEDY REQUESTED | To be made whole for all lost benefits that employees are entitled to. |

(Compl. Ex. 3, ECF No. 1-3.) Pechiney denied the grievance on October 2.

3

In the meantime, representatives of the Union and Bemis met to discuss Bemis' plans for the facilities. Bemis made clear that it was not accepting the existing CBA and that if the Union did not accept the less favorable terms of the CBAs it was offering (a separate agreement for each plant), the current employees would lose their jobs and Bemis would hire new employees. Faced with such a choice, the Union recommended and the members voted to accept the CBAs offered by Bemis (the Bemis CBAs) on October 5. The Bemis CBAs were contingent on the asset sale by Pechiney to Bemis and were to become effective on the date of closing.

As Pechiney and Bemis worked to complete the sale, Pechiney and the Union agreed to several more extensions of the CBA. In January, the parties agreed to extend the CBA until the earlier of the closing date for the sale to Bemis or March 31, 2010. In return for the Union's agreement to the extension, Pechiney agreed to pay each active employee a one-time payment of $500.

The sale closed on February 28, 2010. By the terms of the Union's last extension agreement, it would thus appear that the Union's CBA with Pechiney terminated at the end of that day and the new Bemis CBAs became effective on March 1, 2010. All former Pechiney employees became Bemis employees, and actual operations at the facilities continued seamlessly through the sale. No employees suffered interruption of work of any kind.

In the months following the closing, Union Representative Paul Footit made several requests to meet with representatives of Pechiney to discuss what the Union considered to be outstanding issues. On April 30, 2010, Footit wrote Sarah Schaefer, in-house counsel for Pechiney, requesting a meeting to discuss "the affects [sic] of the sale in regards to the severance language and the outstanding grievances." (ECF No. 26-11.) On May 26, 2010, having yet to receive a meeting

4

invitation, Footit wrote Schaefer another letter threatening to file a charge with the National Labor Relations Board if a meeting date was not in place by June 15. (ECF No. 26-13.)

On June 11, 2010, the parties met and discussed three outstanding grievances. They did not reach any agreement. Footit sent a proposal to Pechiney personnel on August 26, 2010, and Pechiney eventually responded on January 14, 2011. Pechiney indicated it was denying two grievances, including number 243-13-09, and offering to settle one. Regarding number 243-13-09, Pechiney wrote:

> Union Grievance 243-13-09 alleges the occurrence date of September 18, 2009: The successors and assigns clause contained in Article XXXVII [sic] of the applicable collective bargaining agreement (CBA) does not place any affirmative duty on [Pechiney] to require Bemis, or any asset purchaser to assume or be bound by the CBA. Additionally, it is [Pechiney's] understanding that Bemis has recognized your union, and, in fact, entered into a new collective bargaining agreement with your union. Therefore, the grievance is denied.

(ECF No. 26-15.) The Union responded on January 27, 2011:

> It is the Union's contention that this is a valid grievance between the United Steelworkers on behalf of its Local 2-148 and Pechiney Plastic Packaging, Inc. It was not until after February 28, 2010 that the Union was made aware by company official Bill Gleason that they would not pay severance under the contract. The March 1, 2000 [sic] date on the grievance is well within the contractual time limits for filing a grievance and was filed within those time limits after learning that [ ] Pechiney would not adhere to Section XXXVI, Severance Allowance, of the contract and its extensions. The answer to this grievance is not acceptable and we request that it be arbitrated in accordance with Section XXX and Section XXXII. The Union will be prepared to enforce its arbitration right through Section 301 of the National Labor Relations Act if needed.

(ECF No. 26-16.) Pechiney responded on February 11, 2011, claiming the severance issue, which Pechiney claimed the Union was raising at this late date for the first time, was not properly grieved

5

under the CBA, and that such a claim was baseless in any event since the union employees had retained their jobs at the plants that were now being operated by Bemis. The Union filed a request for arbitration.

**B. Arbitration Process and Award**

The CBA between Pechiney and the Union contained a grievance procedure, including an arbitration provision, that provided in pertinent part:

> Section XXX
> ADJUSTMENT OF COMPLAINTS
>
> 1. For the purpose of this Agreement the term "grievance" or "issues" means any dispute between the Company and the Union, or between the Company and any employee concerning the effect, interpretation, application, claim of breach, or violation of this Agreement.
>
> 2. The local Union shall select a Standing Adjustment Committee which shall present the issues that may arise to the appointed representatives of the Company. The Adjustment Committee shall represent the signatory Union as the bargaining agency. The names of the Committee members shall be filed with the Company.
>
> 3. Issues shall be settled in the following manner:
>
>> a. Between the aggrieved employee, one member of the Standing Committee, and the Supervisor, or at the option of the aggrieved employee, between themselves and the Supervisor. It is understood, however, that the Union may have a member of the Standing Committee present. Any grievance shall be presented to the Company not later than ten (10) working days after the aggrieved employee or Union knew of the action giving cause to the grievance. If not presented within such time, the grievance shall be deemed to have been waived[.]
>>
>> b. If no satisfactory settlement is made within three (3) days, the aggrieved employee will refer the question to the Union Standing Committee, who will reduce the grievance to writing and present it to a representative of the Human Resources Department and the Manager of Operations. If no satisfactory settlement is made within five (5) days, it shall be referred to the Plant Manager.

> c. If no settlement is reached within ten (10) days the grievance will be appealed to the Manager, Labor Relations through notification to the Plant Manager.
>
> d. In the event that no settlement is reached within ten (10) days, it shall be referred to arbitration. The parties shall ask the Federal Mediation and Conciliation Service to submit to them a list of seven (7) qualified arbitrators. The Company and the Union Representatives shall determine by lot the order of elimination and thereafter shall, in that order alternately strike from the list three names each and the seventh and remaining name shall become arbitrator.
>
> . . . .
>
> f. The parties agree to follow each of the foregoing steps in the processing of a grievance and if in any step the Company's representative fails to give his written answer within the time limits there-in set forth, the Union may appeal the grievance to the next step at the expiration of such time limit.
>
> g. . . . Time limits outlined in this section may be extended by mutual agreement of the parties.

(CBA § XXX, Compl. Ex. 2, ECF No. 1-2 at 79–81.) Pursuant to this provision, the parties ultimately agreed to present their dispute to arbitrator Paul Gordon of Madison, Wisconsin. The CBA outlined the arbitrator's authority as follows:

> The arbitrator shall be empowered to render a decision to be final and binding upon all parties to this Agreement. It is understood that the function of the Arbitrator shall be to interpret and apply this agreement. However, the Arbitrator shall have no power to arbitrate general wage adjustments, or to add to or subtract from or to modify and extend any of the terms of this Agreement or any agreement made supplementary hereto except by mutual consent of the Company and the Union.

(*Id.* § XXXII.)

As a threshold matter, Pechiney objected to the successorship grievance as untimely and moot due to the new collective bargaining agreements reached by the Union with Bemis and the

7

parties' January 27, 2010 agreement to terminate all obligations of the CBA as of the closing. Pechiney also argued that the issue of severance benefits was not properly before the Arbitrator because the Union had never filed a grievance raising that issue. The parties agreed to a bifurcated hearing to allow the Arbitrator to decide the timeliness issue before addressing the merits. Following that hearing, the Arbitrator ruled that the Union's grievance was timely and that the language of the grievance was broad enough to include the issue of severance benefits. The parties thereafter proceeded to a hearing on the merits with Pechiney continuing its claim that the arbitrator lacked jurisdiction over the issue of severance benefits.

On the merits, Arbitrator Gordon found Pechiney violated both contract provisions at issue. With respect to the successorship clause, the Arbitrator held that language of the provision required that Pechiney condition the sale of the plants on Bemis' agreement to assume the CBA. Pechiney's failure to do so constituted a breach of the CBA for which the Union was entitled to a make whole remedy. On the issue of severance, the Arbitrator ruled that even though the plants remained operating and no employee lost his or her position as a result of the sale, the employees were nevertheless entitled to severance benefits under the terms of the CBA. This was because Pechiney terminated the employees when it transferred the plants to Bemis and, at least as far as Pechiney was concerned, it closed the plants as well. The fact that Bemis hired the employees and continued to operate the plants, the Arbitrator concluded, did not mean they were not entitled to severance benefits under the Union's CBA with Pechiney.

Given violations of these two provisions, the arbitrator determined that the Union was entitled to a make whole remedy. The arbitrator awarded the difference in the benefits under the Pechiney CBA compared to the Bemis CBA as the remedy for the violation of Section XXXV, and

he awarded the severance allowance as the remedy for the violation of Section XXXVI. The arbitrator retained jurisdiction over the matter to allow the parties to identify the differences in benefits for calculating the Section XXXV remedy, and Pechiney filed this action to vacate the award. The arbitrator is currently holding the arbitration proceedings in abeyance pending the outcome of this action.

## II. ANALYSIS

Judicial review of an arbitration award is extremely limited. The Seventh Circuit has summarized the standard of review as follows:

> The examination of an arbitral award centers on whether the award "draws its essence" from the CBA. Indeed our review is close to nonexistent if the arbitrator "interprets" rather than "revises" the collective bargaining agreement. If an arbitrator is even arguably acting within the scope of his authority in interpreting the CBA, his decision will be enforced. This applies even if the court is convinced he committed [a] serious error of fact or law in reaching his decision.

*Monee Nursery & Landscaping Co. v. Intern. Union of Operating Engineers*, 348 F.3d 671, 675 (7th Cir. 2003) (internal citations and quotations omitted).

The reason for this narrow standard of review is clear—that is what the parties to the agreement have bargained for. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *United Paperworkers v. Misco*, 484 U.S. 29, 37–38 (1987); *see also Chicago Typographical Union v. Chicago Sun-Times, Inc.*, 935 F.2d 1501, 1505 (7th Cir. 1991) ("An agreement to submit a dispute over the interpretation of a labor or other contract to arbitration is a contractual commitment to abide by the arbitrator's

9

interpretation."). Thus, so long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, his decision cannot be overturned. *Misco*, 484 U.S. at 38. "The court is forbidden to substitute its own interpretation even if convinced that the arbitrator's interpretation was not only wrong, but plainly wrong." *Chicago Typographical Union*, 935 F.2d at 1505.

**A. Successorship**

Pechiney argues that, notwithstanding this very deferential standard of review, the award finding a violation of the successorship clause must be vacated. Pechiney's principal contention is that rather than merely interpreting the CBA, the arbitrator improperly added to it. Pechiney argues Section XXXV does not contain affirmative, obligation-creating language; thus, because the arbitrator imposed a duty on Pechiney where there was not one, the award does not draw its essence from the CBA. I cannot agree.

The arbitrator began his analysis of the successorship issue by noting that a successor clause does not bind an asset purchaser to an existing CBA. (App'x in Supp. of Pechiney Mot. to Vacate, ECF No. 27 at 26.) *NLRB v. Burns International Security Service* held that absent agreement to become bound, a successor contractor providing security services at a facility does not take on the CBA negotiated and entered into by its predecessor. 406 U.S. 272 (1972). And more directly on point, *Howard Johnson Co. v. Detroit Local Joint Executive Bd., AFL-CIO* held "nothing in the federal labor laws 'requires that an employer . . . who purchases the assets of a business be obligated to hire all of the employees of the predecessor though it is possible that such an obligation might be

assumed by the employer.'" 417 U.S. 249, 261 (1974) (quoting *Burns*, 406 U.S. at 280 n.5). Thus, the arbitrator noted, Bemis had no obligation to assume the CBA unless Pechiney made it a condition of the sale.

The arbitrator then turned to the language of the successor clause. To repeat, that provision states that "no merger, purchase, sale, transfer, assignment or consolidation, shall terminate or suspend this contract or relieve an employer (as provided hereunder) a transferee, purchasee, successor, or assignee, from the obligation to comply with the terms and conditions of this contract." (CBA § XXXV.) The arbitrator first found that the sale of the Pechiney facilities to Bemis constituted a "sale" within the meaning of this successor clause. He noted that the plain language of the section does not limit its applicability to a stock sale or sale of all or controlling interest in Pechiney or any of its owners. To add such a limitation to the section would violate the provision prohibiting the arbitrator from adding to the terms of the CBA.

The arbitrator went on to hold that upon completion of the sale, Bemis was a "transferee" within the plain meaning of the provision, and thereafter an "employer." Thus, as applied to the facts of this case, the successorship clause stated that the sale of the Pechiney facilities to Bemis could not terminate the CBA or relieve Bemis of the obligation to comply with its terms and conditions. Given the holdings of *Burns* and *Howard Johnson* that a successor could not be held to a CBA its predecessor had signed absent its own agreement, the arbitrator reasoned that in order to avoid termination of the CBA by such a sale, the sale had to be conditioned upon the purchaser assuming Pechiney's obligations thereunder. Any other reading, the arbitrator noted, would render the successor clause meaningless. (App'x in Supp. of Pechiney Mot. to Vacate, ECF No. 27 at 27–29.) The arbitrator therefore concluded that by failing to condition the sale of its assets on the purchaser's

agreement to assume the obligations of the CBA, Pechiney had breached the successorship clause of the agreement.

Pechiney argues that the arbitrator improperly imposed an obligation on it to require a purchaser to assume its CBA rather than negotiate its own. Some agreements, Pechiney acknowledges, contain such an obligation. "A labor agreement may impose some affirmative duty on the employer to make the labor agreement binding on a successor. The most typical affirmative language would include a phrase such as 'as a condition of sale.'" (Pl.'s Br. 26, ECF No. 25.) However, no such obligation is expressly stated in the CBA, Pechiney contends, and thus the arbitrator exceeded his authority in creating it.

But by agreeing that no sale would terminate the CBA, Pechiney was in effect promising that it would not enter any agreement to sell its facilities that would terminate the CBA. Unless the CBA was otherwise terminated, this would mean that Pechiney promised that it would not agree to such a sale without requiring the purchaser to assume its obligations under the CBA. Seen in this light, the obligation to require the purchaser to assume the CBA was not created by the arbitrator, but logically arises from Pechiney's agreement set forth in the successorship provision that a sale could not terminate the CBA. No other reading makes sense when the sale takes place during the term of the agreement. Pechiney's reading renders the clause mere surplusage.

Of course, if the CBA is otherwise terminated at the time of the sale, then there would be no obligation to condition the sale on the purchaser's agreement to assume the CBA. As the court noted at oral argument, the successorship clause states only that a sale will not terminate the CBA, not that the CBA cannot be terminated in some other way and then the facilities sold. That appears to have been what Pechiney was attempting to accomplish here. The CBA was due to expire on July

12

31, 2009. Since it was trying to sell the facilities, Pechiney obviously did not intend to renew the CBA and therefore entered into a series of agreements to extend the CBA until the closing occurred. If the CBA was properly terminated by some occurrence *other than the sale*, then it would seem no violation of the successorship clause occurred.

In its lead brief, Pechiney does assert an argument based on Section II, the termination provision of the CBA, but it is not this one. Pechiney argues its obligations under the contract were automatically cancelled when the contract terminated February 28, 2010. (*See* Pl.'s Br. 28–29, ECF No. 25) ("Even if Pechiney could arguably be liable up to February 28, 2010 for any contractual shortfall (there were none), it could not be liable after this date."). According to Pechiney, "[t]o the extent that the remedy would attempt to impose on Pechiney an obligation beyond the end date of the Pechiney-Union contract, that remedy is prohibited by Section II of the CBA and the limitation in the Arbitrator's authority in Section XXXII." (*Id.*)

The Union contends, however, that Pechiney failed to raise any argument based on Section II during the arbitration proceedings. (*See* Defs.' Br. 25, ECF No. 29; Robbins Decl. ¶ 4, ECF No. 30.) Pechiney does not dispute the Union's contention in its reply. "The failure to pose an available argument to the arbitrator waives that argument in collateral proceedings to enforce or vacate the arbitration award." *Ganton Tech. v. UAW Local 62*, 358 F.3d 459, 462 (7th Cir. 2004). "Arbitration would not be an efficient and cost-effective method of resolving labor disputes if federal courts indulged late arguments that were not brought to the attention of the arbitrator below." *Id.* It follows that any argument that the CBA was otherwise terminated is waived. It should also be noted that the argument that a claim for severance benefits cannot be made after termination of a CBA has been rejected by the Supreme Court. *Nolde Bros., Inc. v. Local No. 358, Bakery and*

13

*Confectionery Workers Union, ALF-CIO*, 430 U.S. 243, 249–50 (1977). In any event, based on the arguments before him, and under the deferential standard of review that applies to arbitration awards, the Arbitrator's ruling on the successorship issue must therefore stand.

**B. Severance**

    **1. Arbitrability**

At the outset, Pechiney argued that the Arbitrator had no jurisdiction over the Union's claim for severance benefits. There is no dispute that Pechiney has preserved this issue under *IAMAW Lodge No. 1777 v. Fansteel, Inc.*, 900 F.2d 1005, 1010 (7th Cir. 1990). The severance issue was not arbitrable, Pechiney argues, because the Union never filed a grievance over severance benefits. Because a grievance is a "jurisdictional prerequisite" to arbitration, Pechiney contends that the Union's failure to file a grievance deprived the Arbitrator of jurisdiction and renders his award a nullity that this court must vacate.

The Arbitrator found, however, that the grievance filed by the Union upon being informed that Bemis would not be required to assume Pechiney's obligations under the CBA was sufficiently broad to include the issue of severance benefits. The Arbitrator noted that the grievance charged the company with violating a number of specific sections of the CBA "and any other provisions of the Agreement that may apply" and requested as a remedy "to be made whole for all lost benefits that employees are entitled to." The grievance was prospective, as it was not yet clear what benefits would be lost. As soon after the closing as the Union realized that Pechiney did not intend to pay severance benefits, the Union began its efforts to meet with Pechiney to discuss the benefits its members had lost, including severance. As a result, Pechiney was able to discuss severance benefits during the grievance process and suffered no prejudice in not having it expressly mentioned in the

grievance. Based on these considerations, the Arbitrator concluded that the issue of severance benefits fell within the grievance filed by the Union and was properly before him.

Pechiney challenges this ruling, claiming that it is subject to *de novo* review by this court since it goes to the foundational question of whether the severance issue is arbitrable. In pressing for a *de novo* standard of review, however, Pechiney has confused the question of substantive arbitrability, which must be decided by the courts, with procedural arbitrability, which is decided by the arbitrator, subject to the extremely deferential standard of review set forth above. Questions such as whether the parties have consented to arbitration in general or whether the dispute falls within the category of disputes they agreed to arbitrate, questions of substantive arbitrability, are for the court to decide. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). Procedural questions, on the other hand, such as whether the steps in the process used to resolve grievances have been correctly followed, are presumptively not for the judge, but for an arbitrator, to decide. *Id.*; *see also John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546–47 (1964). *Granite Rock Co. v. International Broth. of Teamsters*, 561 U.S. 287 (2010), deals with the question of contract formation and does not apply here.

The question whether the grievance filed by the Union in this case was broad enough to cover a dispute over severance benefits clearly falls into the procedural category, and is thus reviewed under the deferential standard of review. *See Yellow Cab Co. v. Democratic Union Organizing Committee, Local 777, S. I. U. N. A., AFL-CIO*, 398 F.2d 735 (7th Cir. 1968) (holding that issue whether the union had complied with contractual requirements that grievances be submitted in writing and that requests for arbitration be submitted within twenty days after the Company's adverse decision on a grievance are procedural issues subject to deferential standard of review). Whether

15

one views the original grievance as including severance or concludes that it was effectively added later by amendment, is for the Arbitrator to decide. Under the deferential standard of review that applies to such determinations, the Arbitrator's ruling that the severance issue was properly before him must stand.

One of the reasons Pechiney thinks it is clear that there was no severance grievance is that Union representatives contacted Pechiney to discuss "the affects of the sale in regards to the severance language *and* the outstanding grievances." Pechiney claims the disjunctive "and" shows the Union knew the outstanding grievances, including number 243-13-09, did not cover severance. And Pechiney claims the misspelled reference to "effects bargaining," which is something an employer that sells its assets may be obligated to engage in under Section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5), portends the proper handling of the severance issue, which is that it be resolved, if at all, only under the exclusive jurisdiction of the National Labor Relations Board.

Pechiney's argument is unconvincing. It assumes a knowledge of law and precision in the use of language by a union representative that the record does not support. Moreover, the unstated premise that private parties cannot agree to arbitrate something that is within the realm of "effects bargaining" is wrong. The fact that the NLRB has exclusive jurisdiction to remedy unfair labor practices by employers and unions does not mean that the Union and Pechiney could not agree to arbitrate disputes over severance. *See Vaca v. Sipes*, 386 U.S. 171, 183–84 (1967) ("If an employee is discharged without cause in violation of [a CBA], that the employer's conduct may be an unfair labor practice does not preclude a suit by the union against the employer to compel arbitration of the employee's grievance, the adjudication of the claim by the arbitrator, or a suit to enforce the resulting

16

arbitration award." (citing *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564 (1960))). In any event, it is clear Pechiney was on notice that the Union claimed an entitlement to severance benefits.

For this reason, and given the broad language used in the grievance and the procedural history recounted by the Arbitrator, his conclusion that the Unions had filed a grievance over the severance issue is sound. Under the deferential standard of review it would be improper for me to hold otherwise. I therefore proceed to the merits of the severance issue.

### 2. The Merits

Pechiney also argues that even if the deferential standard of review applies and even if the arbitrator had jurisdiction, the arbitrator's award of severance must be vacated because the arbitrator exceeded his authority by adding to the contract. The severance clause provides: "If the Company closes a plant completely and permanently, employees whose employment is terminated as a result thereof . . . shall be entitled to [the specified severance allowance]." Pechiney notes that the arbitrator here found "[t]he terminations were due to the asset sale from Pechiney to Bemis." (Award at 33.) Thus, according to Pechiney, the arbitrator's inquiry should have ended because the terminations were not the result of a plant closure, as required under Section XXXVI, but were due to the plants' sale. Pechiney claims the arbitrator then exceeded his authority by proceeding to find Section XXXVI somehow applied anyway. (Pl.'s Br. 25, ECF No. 25.) Once again, I disagree.

Pechiney acknowledges that the arbitrator's award finding a breach of Section XXXVI, like it had regarding Section XXXV, was based on the language of the contract. The arbitrator used a dictionary definition of "close" to conclude that Pechiney indeed closed the plants. The arbitrator then noted that severance provision:

17

must also be read in its entirety, which includes the context of . . . "whose employment is terminated as a result thereof . . . ." Termination is the result of the closure. The employees were terminated by the Company. Closing the plants completely and permanently is the reason why the Company terminated the employees.

(Award at 36) (omissions in original).

The fact that Pechiney calls this discussion "circular" merely highlights that Pechiney's basis for vacating the award is really nothing more than a claim that the arbitrator interpreted the contract incorrectly. Pechiney urged the arbitrator to find the severance provision inapplicable because the employees were not "terminated" when they remained employed by Bemis. To be sure, this is a reasonable, likely the most reasonable, interpretation, but the arbitrator did not exceed his authority by rejecting it and interpreting the contract differently. He found that "in reality Pechiney terminated their employment and acknowledged that in writing. They had to apply with Bemis to be hired by that company. It is this resulting termination of employment by Pechiney which ultimately triggers the severance allowance." (*Id.*) These words do not add terms to the contract, as Pechiney argues, and they do not "manifest an infidelity to [the arbitrator's] obligation" that would warrant disrupting the award. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960). For all of these reasons, Pechiney's motion to vacate the arbitrator's award of severance will also be denied, and the Union's motion to enforce will be granted.

## C. Attorney's Fees

The Union requests reasonable attorney's fees and costs incurred in defending Pechiney's motion to vacate and in bringing the motion to enforce. The Seventh Circuit has noted an "increasing tendency of courts to order a party feebly opposing arbitration (or its outcome) to pay the winner's legal fees." *Prod. & Maint. Emps.' Local 504 v. Roadmaster Corporation*, 916 F.2d

18

1161, 1163 (7th Cir. 1990). In *Roadmaster*, the court of appeals ordered that the loser pay the winner reasonable attorney's fees as a sanction under Fed. R. App. P. 38 for filing a frivolous appeal. The operative rule here is Fed. R. Civ. P. 11, but the question is still whether Pechiney's arguments were frivolous. Although it is extremely difficult to vacate and arbitration award, I do not find Pechiney's arguments to be frivolous. The stakes of the case appear substantial, and given the fact that Pechiney and the Union had agreed to a termination date for the CBA in return for lump sum payments to each of the Union employees, the conclusion that Pechiney nevertheless breached the successor provision is at least questionable. I also note an award granting severance when no employees stopped working and the plants never actually closed in the normal sense of the word does seem like an unusual result, even if based on a good faith interpretation of the contract. Though Pechiney has lost before me, I cannot say that its arguments were frivolous, even under the deferential standard of review that applies. Accordingly, the Union's request for attorney's fees and costs will be denied.

### III. CONCLUSION

Accordingly, for the reasons set forth above, Pechiney's motion to vacate the award is **DENIED** and the Union's motion to enforce the award is **GRANTED**. The Union's request for attorney's fees and costs is **DENIED**, and Pechiney's motion to cite supplemental authority is **GRANTED**. The Clerk is directed to enter judgment that the arbitration award should be and hereby is enforced.

**SO ORDERED** this 11th day of November, 2014.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court